## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| SUBURBAN AIR EXPRESS, INC., | ) | |
| a Nebraska Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-21-39-G |
| | ) | |
| TOHME FAMILY TRUST, a Texas | ) | |
| Family Trust, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Now before the Court are the Motions for Summary Judgment filed by Plaintiff Suburban Air Express, Inc. ("Suburban") and Defendant Tohme Family Trust (the "Trust") (Doc. Nos. 43, 45). The parties have each submitted Responses (Doc. Nos. 46, 47), and the Trust has submitted a Reply (Doc. No. 48). Having reviewed the parties' submissions, the Court makes its determination.

In October 2020, Suburban bought a 1979 Cessna 501 (the "Aircraft"), along with its engines and other equipment, from the Trust. *See* Pl.'s Mot. Ex. 7, Agt. (Doc. No. 43-7) at 1. After closing, a dispute arose as to whether Suburban or the Trust is responsible for payment of a deferred maintenance cost—totaling approximately $117,378.98—owed as part of the Aircraft's enrollment in the Williams Jet TAP Blue engine maintenance program. Suburban contends that the Trust's failure to pay the $117,378.98 maintenance cost, and to disclose that the cost was owed under that program, constitutes breach of contract. *See* Am. Compl. (Doc. No. 29). Suburban further contends that the failure to disclose the $117,378.98 deferred maintenance cost was fraud. *See id.*

The Trust moves that summary judgment be entered in its favor on Suburban's fraud claim. *See* Def.'s Mot. at 16-17, 22. Suburban contends that it is entitled to summary judgment on both the contract and fraud claims. *See* Pl.'s Mot. at 10, 12.

I.     *Standard of Review*

Summary judgment is a means of testing in advance of trial whether the available evidence would permit a reasonable jury to find in favor of the party asserting a claim. The Court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A party that moves for summary judgment has the burden of showing that the undisputed material facts require judgment as a matter of law in its favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To defeat summary judgment, the nonmovant need not convince the Court that it will prevail at trial, but it must cite sufficient evidence admissible at trial to allow a reasonable jury to find in the nonmovant's favor—i.e., to show that there is a question of material fact that must be resolved by the jury. *See Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). The Court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

Parties may establish the existence or nonexistence of a material disputed fact by:

•     citing to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in the record; or

•     demonstrating "that the materials cited do not establish the absence or

presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1)(A), (B).  While the Court views the evidence and the inferences drawn from the record in the light most favorable to the nonmoving party, *see Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the [nonmovant]."  *Liberty Lobby*, 477 U.S. at 252.

When, however, the moving party has the burden of proof at trial, "a more stringent summary judgment standard applies."  *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008).  The moving party cannot carry its burden by "pointing to parts of the record that [the movant] believes illustrate the absence of a genuine issue of material fact."  *Id.*  Rather, to obtain summary judgment on its own claim or defense, a movant "must establish, as a matter of law, all essential elements of the issue before the nonmovant can be obligated to bring forward any specific facts alleged to rebut the movant's case."  *Id.*  Thus, if a party who would bear the burden of persuasion at trial lacks sufficient evidence on an essential element of a claim or defense, all other factual issues concerning the claim or defense become immaterial.  *See Celotex*, 477 U.S. at 322; *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

Regarding cross-motions for summary judgment, the Tenth Circuit has explained:

"The filing of cross-motions for summary judgment does not necessarily concede the absence of a material issue of fact.  This must be so because by the filing of a motion a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues

remain in the event his adversary's theory is adopted." *Nafco Oil & Gas, Inc. v. Appleman*, 380 F.2d 323, 324-25 (10th Cir. 1967). Accordingly, "cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007). "Even where the parties file cross motions pursuant to Rule 56, summary judgment is inappropriate if disputes remain as to material facts." *Id.*

*Brown v. Perez*, 835 F.3d 1223, 1230 n.3 (10th Cir. 2016) (alteration and citations omitted).

II.     *Undisputed Material Facts*[1]

Mark Meyer, the president of Suburban, became interested in the Aircraft after seeing it listed for sale in an advertisement. *See* Pl.'s Mot. Ex. 1 (Doc. No. 43-1) at 24:2-14. Mr. Meyer contacted DeeAnna Underhill of ATI Jet, Inc. ("ATI Jet") to inquire about the details and availability of the Aircraft. *See* Pl.'s Mot. Ex. 6 (Doc. No. 43-6); Pl.'s Mot. Ex. 1, at 25:2-19; Pl.'s Mot. Ex. 4 (Doc. No. 43-4) at 5:17-21.[2]

The Aircraft was enrolled in an engine maintenance program with Williams International ("Williams"), governed by a contract between the Trust and Williams (the

---

[1] Facts relied upon are uncontroverted or, where genuinely disputed, identified as such and viewed in the light most favorable to the applicable nonmoving party.

[2] As detailed below, the role of ATI Jet and Ms. Underhill in the sale of the Aircraft is disputed. The parties disagree as to whether the advertisement listed the Aircraft as "for sale by ATI Jet." *Compare* Pl.'s Mot. ¶ 3 (stating that the Aircraft "was for sale by ATI Jet"), *with* Def.'s Resp. ¶ 3(c) (denying the Aircraft was listed for sale by ATI Jet). The "Aircraft Equipment List and Status" for the Aircraft includes the ATI Jet logo. Pl.'s Mot. Ex. 5 (Doc. No. 43-5). There is no dispute that Ms. Underhill acted as the principal contact for the seller during the negotiation of the sale of the Aircraft, that Ms. Underhill was the Director of National Sales for ATI Jet, and that her correspondence to Mr. Meyer concerning the Aircraft came from an ATI Jet email address and displayed the ATI Jet logo, address, and telephone number. *See, e.g.*, Pl.'s Mot. Ex. 6. Based on these and other facts, Suburban contends that ATI Jet and Ms. Underhill were agents of the Trust; the Trust denies an agency relationship.

4

"Williams Contract"). In April 2020, the Trust amended that contract, upgrading to the Williams Jet TAP Blue engine maintenance program (the "Williams Amendment"). *See* Def.'s Mot. Ex. 5 (Doc. No. 45-5) at 15:14-17:13; *see also* Pl.'s Mot. Ex. 10, Amdt. (Doc. No. 43-10). Pursuant to the Williams Amendment, two charges—(1) a $27,000 upgrade fee, and (2) engine maintenance costs totaling approximately $117,378.98—were deferred until the next "hot section" inspection.[3] *See* Def.'s Mot. Ex. 5, at 15:14-17:13; Amdt. Consequently, approximately $144,378.98 was due to be paid to Williams at the time of the Aircraft's next hot section inspection. *See* Def.'s Mot. Ex. 5, at 15:14-17:13.[4]

Mr. Meyers testified that the advertisement indicated that the Aircraft was enrolled in the Williams Jet TAP Blue engine maintenance program. Pl.'s Mot. Ex. 1, at 24:10-14.[5] During the discussion that transpired between Mr. Meyer and Ms. Underhill after Mr. Meyer viewed the Aircraft advertisement, Ms. Underhill stated that there was a $27,000 deferral due on the Aircraft under that program. *See id.* at 26:13-21, 27:10-15.

Mr. Meyer went to the ATI Jet facility and inspected the Aircraft. *Id.* at 6:10-19, 29:5-24; Def.'s Resp. Ex. 1 (Doc. No. 47-1) at 46:15-47:8. Sometime before Mr. Meyer's

---

[3] A hot section inspection, sometimes referred to as an "MPI," is an engine inspection done when the engine reaches a specified number of hours in service. *See* Pl.'s Mot. Ex. 1, at 22:8-23:25; *see also* Def.'s Mot. at 6.

[4] The Trust characterizes the $117,378.98 deferred cost slightly differently, stating that it is a fee that "reflects deferred hourly costs associated with a bargained-for exchange that provided, among other things, a minimum-hours forgiveness benefit in connection with the upgrade." Def.'s Resp. ¶ 8. The distinction is not material to the Court's analysis.

[5] The printed advertisement seen by Mr. Meyer is not in the record before the Court.

inspection of the Aircraft, Ms. Underhill again mentioned the $27,000 deferred upgrade fee. *See* Pl.'s Mot. Ex. 1, at 27:23-28:4.

As part of the inspection, records related to the Aircraft were provided, in boxes, for Mr. Meyer's review and examination. *See id.* at 35:1-7; Pl.'s Mot. Ex. 3 (Doc. No. 43-3) at 24:24-25:2. The parties agree that the Williams Contract and Amendment would have informed Mr. Meyer that engine maintenance costs had been deferred and would be due at the time of the next hot section inspection. But the parties dispute whether those documents were contained in the records made available for Mr. Meyer's review. Suburban states that "the Williams Jet TAP Blue Program and Amendment were not contained in the two . . . boxes of books and records Mr. Meyer . . . examined on [the date of inspection]." Pl.'s Mot. ¶ 6 (citing *id.* Ex. 1, at 35:1-7 ("Q: So was there anything on the Williams engine contract in the records that you reviewed? [Meyer]: No.")). The Trust's position is that Roberto Tohme, a principal of the Trust, personally ensured that the Williams Contract, including an amendment,[6] was placed in a box prior to Mr. Meyer's inspection. *See* Pl.'s Mot. Ex. 2 (Doc. No. 43-2) at 12:1-11. Mr. Meyer did not ask to see the Trust's agreement with Williams during the inspection or at any time prior to executing the Agreement. *See* Pl.'s Mot. Ex. 1, at 35:8-10.

Mr. Meyer, on behalf of Suburban, negotiated the purchase of the Aircraft and the terms of the Agreement. *See id.* at 31:1-36:24. Lyle Byrum, trustee of the Tohme Family

---

[6] Mr. Tohme's deposition testimony is not clear as to whether the Williams Amendment is the document he is referring to as having been placed in the box of records. *See* Pl.'s Mot. Ex. 2, at 12:9-14.

Trust, drafted the Agreement.  Pl.'s Mot. Ex. 3, at 21:7-9.  On October 8, 2020, the parties settled on a purchase price of $900,000.00 and executed the Agreement, with closing set for a few weeks later.  *See* Pl.'s Mot. Ex. 1, at 31:22-25; Agt. at 1, 7.  Prior to taking delivery, Suburban confirmed that the Williams Contract was transferrable to Suburban. Pl.'s Mot. Ex. 1, at 19:24-20:24.

Suburban contends that on October 30, 2020, after closing, it discovered that $117,378.98 in "deferred maintenance charges" would be due on the Aircraft at the time of the next hot section inspection.  *See* Pl.'s Mot. ¶ 11; Pl.'s Mot. Ex. 9 (Doc. No. 43-9) at 1-2.[7]

III.    *Discussion*

As noted, Suburban moves for summary judgment in its favor on its own claims of breach of contract and fraud.  The Trust moves for summary judgment in its favor on Suburban's fraud claim.[8]

---

[7] In December 2020, after the sale, Suburban asked Williams for copies of the Williams Contract and Amendment.  *See* Pl.'s Mot. Ex. 8 (Doc. No. 43-8).  Williams informed Suburban that it could not provide Suburban with "executed documents from different entities/individuals."  *See id*. at 3.

[8] The Agreement prescribes that it "shall be construed in accordance with, and governed by, the laws of the state of Oklahoma."  Agt. § ¶ 10.2.  The parties do not contest the application of Oklahoma state law to Plaintiff's claim for breach of contract, and the Court accepts that Oklahoma substantive law governs the contract claim.  *See Sonic Indus. LLC v. Halleran,* No. CIV-16-709-C, 2017 WL 239388, at *2 (W.D. Okla. Jan. 19, 2017) ("In Oklahoma, contract choice of law rules require the court to apply the law of the state (1) chosen by the parties, (2) where the contract was made or entered into, or (3) the place of performance if indicated in the contract.").  Further, the parties have relied on Oklahoma state law as the law to be applied to Plaintiff's fraud claim.  *See* Pl.'s and Def.'s Mots. (citing Oklahoma state law throughout).  Absent any dispute, the Court will apply Oklahoma substantive law for the fraud claim.

A.  <u>Plaintiff Suburban's Motion for Summary Judgment—Breach of Contract</u>

To recover on a breach of contract claim under Oklahoma law, a plaintiff must establish: "1) formation of a contract; 2) breach of the contract; and 3) damages as a direct result of the breach."  *Digit. Design Grp., Inc. v. Info. Builders, Inc.*, 24 P.3d 834, 843 (Okla. 2001).  "A contract should receive a construction that makes it reasonable, lawful, definite and capable of being carried into effect if it can be done without violating the intent of the parties."  *May v. Mid-Century Ins. Co.*, 151 P.3d 132, 140 (Okla. 2006).

The parties agree that they entered into a valid, enforceable contract for the sale of the Aircraft.  *See* Pl.'s Mot. at 12; Def.'s Resp. at 9-10.  Suburban argues that the "Trust breached the . . . Agreement by failing to disclose and pay $117,378.98 in deferred maintenance fees related to the Williams TAP Blue Program."  Pl.'s Mot. at 12.  Specifically, Suburban contends that the Trust breached three provisions of the Agreement: (1) Section 4.1(iii); (2) Section 10.18; and (3) Exhibit F.  *See* Pl.'s Mot. at 12-13.  The Court considers each provision in turn.

*1.  Section 4.1(iii) of the Purchase Agreement*

Section 4.1(iii) provides:

**4.1 Representations and Warranties of Seller:**

Seller hereby represents and warrants as of the date hereof and as of the Closing Date as follows:

* * *

(iii) Except to the extent incurred by or arising through any action or inaction of Buyer and except for the sales tax that may be caused due to the sale of the Aircraft to Buyer, which shall be paid by Buyer (if any), all taxes, duties, penalties, charges, or invoices or statements with respect to the Aircraft

incurred on and before the Closing Date have been paid or, to the extent that they have not, Seller agrees to pay any and all of the foregoing when due.

Agt. § 4.1(iii). Suburban contends that the $117,378.98 deferred maintenance cost constitutes a charge within the meaning of section 4.1(iii). *See* Pl.'s Mot. at 13. The Trust responds that "this section, by its terms, concerns the Aircraft alone," and creates no obligations or warranties with respect to the engine maintenance program, which is specifically addressed in subsequent provisions. Def.'s Resp. at 19.

Section 10.18 of the Agreement specifically addresses the engine maintenance program, and responsibility for costs owed or owing under that program:

> **10.18 Engine Maintenance Program:** The Aircraft is enrolled on the "Williams TAP BLUE" engine maintenance program, which shall be transferable to the Buyer. Any and all fees, charges or costs related to the TAP BLUE Engine Maintenance program on each respective engine, which is incurred or accrued prior to the engine times at the time of Delivery, excluding any program upgrade deferment costs not due until next hot section, shall be the sole responsibility of the Seller and shall be paid prior to or at the time of Closing. Any and all fees, charges or cost related to the Engine Maintenance program on each respective engine, which is incurred or accrued subsequent to the engine times at the time of Delivery, including any program upgrade deferment costs not due until next hot section, shall be the responsibility of the Buyer. Any transfer fees including but not limited to buy-in fee shall be the responsibility of the Buyer.

Agt. § 10.18. Moreover, as discussed below Exhibit F to the Agreement speaks to the same issues.

Based on the summary-judgment record, the Court concludes that, insofar as the cost at issue here (the $117,378.98 due to Williams at the time of the next hot section inspection), the specific provision of section 10.18 of the Agreement "takes precedent" over the more general provision of section 4.1(iii). *See Cogswell v. Merrill Lynch, Pierce,*

*Fenner & Smith Inc.*, 78 F.3d 474, 480 (10th Cir. 1996) ("[I]t is well established under the generally applicable rules governing contract interpretation that specific provisions . . . take precedence over more general provisions . . . ."). Therefore, Suburban's claim that the Trust breached section 4.1(iii) by failing to pay the $117,378.98 cost fails as a matter of law.

### 2.  Section 10.18 of the Purchase Agreement

As set forth above, section 10.18 of the Agreement specifies that certain costs related to the Williams TAP Blue engine maintenance program are borne by the Trust as seller—"[a]ny and all fees, charges or costs related to the . . . program on each respective engine, which [are] incurred or accrued *prior to* the engine times at the time of Delivery"— but expressly excludes from that obligation "any program upgrade deferment costs not due until next hot section."  Agt. § 10.18 (emphasis added).  The provision then conversely specifies the costs related to that program to be borne by Suburban as buyer—"[a]ny and all fees, charges or cost related to the . . . program on each respective engine, which [are] incurred or accrued *subsequent to* the engine times at the time of Delivery"—and expressly includes in that obligation "any program upgrade deferment costs not due until next hot section."  *Id*. (emphasis added).

The resulting question is whether the $117,378.98 cost is a "program upgrade deferment cost[] not due until next hot section."  *See id*.  Suburban claims it is not.  *See* Pl.'s Mot. at 14; Agt. § 10.18.[9]  The Trust claims it is.  *See* Def.'s Resp. at 19-20 (quoting

_____

[9] Suburban concedes that the $27,000 upgrade fee is a "program upgrade cost" that it "agreed to pay."  *See* Pl.'s Mot. at 13.

Agt. § 10.18).  In so arguing, the Trust notes that both the upgrade fee and maintenance

cost "were agreed to at the same time (at the time of the upgrade), were agreed to for the

same purpose (to facilitate the upgrade), [and] were deferred for the same amount of time

(until the next hot section)."  *Id.* at 19.

Viewing the facts in the light most favorable to the Trust as the nonmovant, the

Court finds that there is a genuine dispute as to whether the $117,378.98 deferred

maintenance cost is a "program upgrade deferment cost[ ] not due until next hot section."

Agt. § 10.18.  This factual dispute precludes summary judgment on the basis of section

10.18 of the Agreement.

3.   *Exhibit F of the Purchase Agreement (the Engine Maintenance*
       *Program Agreement)*

The Agreement's Exhibit F, titled Engine Maintenance Program Agreement, also

addresses responsibility for costs owed or owing under the engine maintenance program,

providing in relevant part:

**ENGINE MAINTENANCE PROGRAM AGREEMENT**

\*\*\*

Before Closing Buyer will receive written confirmation from Williams Tap
Blue that Buyer is approved for Transfer of TAP Blue contract to Buyer.  All
costs of such transfer and assignment shall be borne by the Buyer.

\*\*\*

Any and all fees, charges or cost related to the Engine Maintenance program
on each respective engine, which is incurred or accrued prior to the engine
times at the time of Delivery shall be the responsibility of the Seller and
payable immediately upon demand.

Any and all fees, charges, or cost related to the Engine Maintenance program
on each respective engine, which is incurred or accrued subsequent to the

engine times at the time of Delivery to include deferment costs due at the next hot section due to Buyer upgrading from TAP Elite to TAP Blue program because Williams is phasing out the Elite program.  Tap Blue offers the Buyer extension of hot section and over haul hours, allows for a one time waiver of hours during the contract and includes corrosion coverage/ supplemental service bulletins.  Any transfer fees described above shall be the responsibility of the Buyer.

As a requirement to Buyer[']s obligation to consummate the transaction and accept Delivery of the Aircraft, **Seller shall provide to Buyer written proof of payment of any and all outstanding TAP Blue, not including the deferment transfer, program charges for all engine hours up to the time of closing.**

Agt. Ex. F (emphasis added)

Suburban argues that this language obligated the Trust to pay the $117,378.98 deferred maintenance cost and, further, to disclose proof of payment of that cost as an "outstanding TAP Blue . . . program charge[]." *See* Pl.'s Mot. at 13-14.  The Trust contends that the "deferment transfer" expressly excluded from Exhibit F's disclosure requirement encompasses the $117,378.98 deferred maintenance cost because that cost "was one component of the deferment that Suburban concedes [was] incurred collectively as part of the upgrade from TAP Elite to TAP Blue." *See* Def.'s Resp. at 20-21.

The quoted language of Exhibit F is grammatically flawed and contains terms that are unclear as to what they reference.  Exhibit F—like section 10.18—provides that fees, charges, or costs related to the engine maintenance program incurred or accrued prior to the engine times at the time of delivery shall be the responsibility of the Trust as the seller, but—unlike section 10.18—contains no plain exclusion for "program upgrade deferment costs not due until next hot section." *Compare* Agt. Ex. F, *with* Agt. § 10.18.  It appears possible that the next segment of Exhibit F—"Any and all fees, charges, or costs related to

the Engine Maintenance program on each respective engine, which is incurred or accrued subsequent to the engine times at the time of Delivery to include deferment costs due at the next hot section due to Buyer upgrading from TAP Elite to TAP Blue program because Williams is phasing out the Elite program."—was intended to describe the costs assigned to Suburban as the buyer, but the sentence is incomplete.[10] *See* Agt. Ex. F. A subsequent provision of Exhibit F does, however, exclude "the deferment transfer" from the Trust's obligation to provide Suburban with "written proof of payment of any and all outstanding TAP Blue . . . program charges for all engine hours up to the time of closing." *Id.*

As a result, the meaning of the quoted language of Exhibit F, may differ from that of section 10.18 of the Agreement in a way that would be material to the parties' dispute. Even upon resolution of the proper construction of the Agreement as a whole, there remains a factual dispute as discussed above as to the nature of the $117,378.98 deferred maintenance cost that would be material to the question of whether that cost was part of the "deferment transfer" excluded from the Trust's requirement to provide written proof of payment prior to closing. Accordingly, Suburban has not shown that it is not entitled to summary judgment on this aspect of its breach of contract claim.

B.  Plaintiff Suburban's Motion for Summary Judgment—Fraud

Under Oklahoma law, "[f]raud is a generic term with multiple meanings and is divided into actual fraud and constructive fraud." *Sutton v. David Stanley Chevrolet, Inc.*, 475 P.3d 847, 852 (Okla. 2020). Actual fraud is "the intentional misrepresentation or

---

[10] The Court also notes that it was the Trust (the seller) that upgraded the Williams program to TAP Blue, not Suburban (the buyer). *See* Amdt.

concealment of a material fact which substantially affects another person," while constructive fraud "may be defined as any breach of a duty which gains an advantage for the actor by misleading another to his prejudice." *Manokoune v. State Farm Mut. Auto. Ins. Co.*, 145 P.3d 1081, 1086-87 (Okla. 2006) (omission and internal quotation marks omitted).

A party seeking to establish actual fraud under Oklahoma law must show: "(1) a false material misrepresentation; (2) made as a positive assertion which is known to be false or is made recklessly without knowledge of the truth; (3) with the intention that it be acted upon; and (4) which is relied on by the other party to his detriment." *Simon v. Metro. Prop.*, No. CIV-08-1008-W, 2014 WL 12479649, at *6 (W.D. Okla. Apr. 17, 2014) (citing *Bowman v. Presley*, 212 P.3d 1210 (Okla. 2009)).  Constructive fraud requires largely the same elements but may be based on a party "remain[ing] silent" when it "has a duty to speak"; it "does not necessarily involve any moral guilt, intent to deceive, or actual dishonesty of purpose." *Key Fin., Inc. v. Koon*, 371 P.3d 1133, 1138 (Okla. Civ. App. 2015); *see also Hubbard v. Bryson*, 474 P.2d 407, 410 (Okla. 1970) ("If on account of peculiar circumstances there is a positive duty on the part of one of the parties to a contract to speak, and he remains silent to his benefit and to the detriment of the other party, the failure to speak constitutes fraud."). Whether actual or constructive, "[f]raud is never presumed and each of its elements must be proved by clear and convincing evidence." *Simon*, 2014 WL 12479649, at *6.

For its claim of fraud, Suburban relies on the statements of Ms. Underhill, contending that her simultaneous disclosure of the $27,000 upgrade fee and omission of

mention of the $117,378.98 deferred maintenance cost constituted an intentional misrepresentation of the total amount owed to Williams at the time of the next hot section inspection. Further, Suburban contends that the Trust had a duty to disclose the $117,378.98 deferred maintenance cost and failed to do so, misleading Suburban into entering an unfavorable contract. Generally consistent with the parties' briefing,[11] the Court finds that the theory of constructive fraud is "specifically relevant" to Suburban's allegations and will evaluate Suburban's fraud claim on that basis. *See Sutton*, 475 P.3d at 853 (analyzing unspecified fraud claim under theory of constructive fraud based upon finding that such theory is "specifically relevant to the facts of this case").

In *Sutton*, the Oklahoma Supreme Court addressed fraud based on a partial truth:

When dealing with alleged omissions and partial disclosures, the first question is always whether there was a duty upon the actor to disclose the whole truth. A fiduciary relationship requires full disclosure of material facts. Where there is no fiduciary relationship a legal or equitable duty to disclose all material facts may arise out of the situation of the parties, the nature of the subject matter of the contract, or the particular circumstances surrounding the transaction. In order that suppression of the truth may constitute fraud, there must be a suppression of facts which one party is under a legal or equitable obligation to communicate to the other, and which the other party is entitled to have communicated to him. In other words, the facts concealed must be such as in fair dealing, the one party has a right to expect to be disclosed, and such as the other party is bound to disclose. One may be under no duty to speak, but if he or she undertakes to do so, the truth must be told without suppression of material facts within his or her knowledge or materially qualifying those stated. Fraudulent representations may consist of half-truths calculated to deceive, and a representation literally true is actionable if used to create an impression substantially false. Where the peculiar circumstances give rise to a duty on the part of one of the parties to a contract to disclose material facts and the party remains silent to his or her

---

[11] Suburban describes its claim as one of "fraudulent concealment." Am. Compl. ¶¶ 6-30.

benefit and to the other party's detriment, the failure to speak constitutes fraud.

A review of our jurisprudence in constructive fraud cases reveal a variety of facts and circumstances that will give rise to a duty to disclose material facts. We have consistently found the existence of the requisite circumstances, i.e., that which is necessary to create a duty to disclose, when the offending party created a false impression concerning material facts that was relied upon by the other party to his detriment and to the benefit of the offending party.

*Sutton*, 475 P.3d at 854 (citations omitted).

With respect to Suburban's request that summary judgment be granted to it on its affirmative claim of fraud, at least one genuine question of material fact precludes that relief. As detailed above, the summary-judgment record demonstrates a factual dispute as to whether the Williams Contract and Amendment were provided to Suburban during the inspection of the Aircraft. Because the provision of those documents would constitute a disclosure of the deferred maintenance cost, or at minimum affect the analysis of whether the Trust "created a false impression concerning material facts," *id.*, Suburban is not entitled to summary judgment on its fraud claim.

C. Defendant Tohme Family Trust's Partial Motion for Summary Judgment— Fraud

The Trust contends that "there are no facts that would support a claim of fraud" against the Trust, and so the Trust is entitled to summary judgment in its favor on Suburban's fraud claim. Def.'s Mot. at 5. "Although the issue of fraud is generally a question of fact, summary judgment is appropriate where, under the uncontroverted facts, a plaintiff fails to demonstrate the viability of [its] claim." *PWB Dev., L.L.C. v. Acadia Ins. Co.*, No. CIV-17-387-R, 2018 WL 4088793, at *5 (W.D. Okla. Aug. 27, 2018)

16

(alteration and internal quotation marks omitted); *see also Specialty Beverages*, 537 F.3d at 1181.

The Trust advances the following arguments as to why Suburban's fraud claim is not viable: (1) the facts do not support a claim of actual fraud; (2) Suburban's reliance on Ms. Underhill's representations was unjustifiable; (3) Suburban's claim is barred by the doctrine of *caveat emptor*; (4) the Agreement subsumed any alleged fraud; and (5) there was not an agency relationship between the Trust and ATI Jet or Ms. Underhill, and so the Trust cannot be liable for any fraud perpetrated by ATI Jet or Ms. Underhill.  The Court addresses each argument in turn.

### 1. *Actual Fraud*

The Trust first argues that "Suburban cannot make out a claim of actual fraud." Def.'s Mot. at 17.  As discussed above, the Court has found that the theory of constructive fraud is specifically relevant to Suburban's fraud claim (a conclusion generally agreed with by the Trust).  Therefore, the Court refrains from addressing the Trust's contentions regarding a theory of actual fraud.

### 2. *Unjustifiable Reliance*

To succeed on its fraud claim, Suburban's reliance on any statements or omissions made by the Trust or those acting on behalf of the Trust must have been justifiable.  *See State ex rel. Sw. Bell Tel. Co. v. Brown*, 519 P.2d 491, 495 (Okla. 1974).  The Trust argues that "Suburban's fraud claim is not actionable because it was not justifiable for Suburban to make assumptions regarding the terms of the Williams Contract based upon one or two brief communications with Ms. Underhill."  Def.'s Mot. at 18.  Ms. Underhill, the Trust

contends, had no direct knowledge of the Williams Contract and was merely relaying her secondhand understanding of the Aircraft and the engine maintenance program deferrals. *See id.*

The Trust has not provided evidence reflecting that Suburban would have known that Ms. Underhill lacked understanding or knowledge of the Williams Contract and the $117,378.98 deferred maintenance cost. Ms. Underhill was the Director of National Sales for ATI Jet and provided Suburban with details about the Aircraft and engine maintenance program in response to Mr. Meyer's inquiries, including twice disclosing the $27,000 deferred upgrade fee. *See* Amdt.; Pl.'s Mot. Ex. 1, at 25:2-19; Pl.'s Mot. Ex. 4, at 5:17-21. Moreover, this argument does not address the Trust's alleged failure to speak on an issue that it was under a legal duty to disclose.

Viewing the facts in the light most favorable to Suburban as the nonmovant, the Trust has not shown that any reliance by Suburban upon the Trust's and/or Ms. Underhill's representations or omissions about the Aircraft and deferral fees was unjustified.

### 3. *Caveat Emptor*

The Trust contends that the doctrine of *caveat emptor* bars Suburban's fraud claim. *See* Def.'s Mot. at 18. "An action for fraud may not be predicated on false statements when the allegedly defrauded party could have ascertained the truth with reasonable diligence." *Silver v. Slusher*, 770 P.2d 878, 881 n.8 (Okla. 1988) (emphasis omitted). The Oklahoma Supreme Court has articulated the doctrine of caveat emptor as follows:

> "Where the means of knowledge are at hand and equally available to both
> parties, and the subject of purchase is alike open to their inspection, if the
> purchaser does not avail himself of these means and opportunities, he will

18

not be heard to say that he has been deceived by the vendor's misrepresentations. If, having eyes, he will not see matters directly before them, where no concealment is made or attempted, he will not be entitled to favorable consideration when he complains that he has suffered from his own voluntary blindness, and been misled by overconfidence in the statements of another."

*Nowka v. West*, 186 P. 220, 223 (Okla. 1919) (quoting *Slaughter's Admin. v. Gerson*, 80 U.S. 379, 383 (1871)).

The Trust argues that "[t]he problem here is not that Defendant[] committed fraud; the problem is that Suburban failed to conduct a meaningful inspection to determine what Suburban's obligations to Williams would be if it elected to keep the Aircraft enrolled on the TAP Blue program." Def.'s Mot. at 20. It is undisputed that Suburban had knowledge of the Williams Contract's existence before entering into the Agreement, *see* Pl.'s Mot. Ex. 6, but according to Suburban the Trust concealed the $117,378.98 deferred maintenance cost due under the Williams Amendment. *See* Pl.'s Resp. at 17.

The parties agree that Suburban conducted an inspection of the Aircraft and the Aircraft's records prior to executing the Agreement. *See* Pl.'s Mot. Ex. 1, at 35:1-7; Pl.'s Mot. Ex. 3, at 24:24-25:2. But as previously described the parties dispute whether the Williams Contract and Amendment were contained in the documents provided for Mr. Meyer's review. Additionally, when Suburban later inquired with Williams about the Williams Contract, Williams informed Suburban that it would not provide Suburban with "executed documents from different entities/individuals." *See id.*; Pl.'s Mot. Ex. 8, at 3.

Viewing these facts in the light most favorable to Suburban as the nonmovant, the Court concludes that the Trust is not entitled to summary judgment based on the doctrine of *caveat emptor*.

### 4. Subsumption of Fraud

The Trust argues that the Agreement subsumes any fraud, specifically arguing that Suburban "'disclaim[ed] . . . all expectation or reliance upon any other representation or warranty with respect to the condition of the Aircraft,' and that it '[was] not rely[ing] on any statements or representations of the Seller' in connection with the sale of the Aircraft." Def.'s Mot. at 22 (alterations and omission in original) (quoting Agt. at 17).

A contract, however, cannot subsume fraud if it is "entered into on the basis of a misrepresentation which goes to the contract's *inducement,*" as is alleged here, because such a contract is voidable at the option of the defrauded party. *Young v. Chappell*, 239 P.3d 476, 479 (Okla. Civ. App. 2010) (noting that fraud in the inducement includes a "misrepresentation as to the terms . . . of a contractual relation" "that leads a person to agree to enter into the transaction with a false impression or understanding of the . . . obligation she has undertaken" (internal quotation marks omitted)); *see also Miller v. Troy Laundry Mach. Co.*, 62 P.2d 975, 977 (Okla. 1936). Therefore, the Trust is not entitled to summary judgment on this basis.

### 5. Agency

The Trust contends that Suburban may not recover against the Trust based on "the impression purportedly created by Ms. Underhill's communications because neither ATI [Jet] nor Ms. Underhill [was an] agent[] authorized to make representations regarding the

Aircraft." Def.'s Mot. at 22.  A principal is liable for the tortious acts of its agent committed in furtherance of the principal's business.  *Dill v. Rader*, 533 P.2d 650, 655-56 (Okla. Civ. App. 1975).  "The burden of proving the existence, nature and extent of the agency relationship rests ordinarily upon the party who asserts it," in this case, Suburban.  *Enter. Mgmt. Consultants, Inc. v. State ex rel. Okla. Tax Comm'n*, 768 P.2d 359, 362 (Okla. 1988). "Generally, agency is a question of fact which must be determined by the trier of fact." *Traders Ins. Co. v. Johnson*, 231 P.3d 790, 793 (Okla. Civ. App. 2010).

An agency relationship may be based on either actual or apparent authority.  *See Thornton v. Ford Motor Co.*, 297 P.3d 413, 419-20 (Okla. Civ. App. 2013).  "A principal is subject to vicarious liability for a tort committed by an agent in dealing or communicating with a third party on or purportedly on behalf of the principal when actions taken by the agent with apparent authority constitute the tort or enable the agent to conceal its commission."  *Id.* at 421 (emphasis and  internal quotation marks omitted).  "Apparent authority applies to actors who appear to be agents but are not, as well as to agents who act beyond the scope of their actual authority."  *Id.* at 420 (emphasis and internal quotation marks omitted).  Under Oklahoma law, a party alleging apparent authority must show the following elements to impose liability on the alleged principal for the acts of another: "'(1) conduct of the principal which would reasonably lead the third party to believe that the agent was authorized to act on behalf of the principal, (2) reliance thereon by the third person, and (3) change of position by the third party to his detriment."  *Id.* at 421 (alteration and emphasis omitted) (quoting *Sparks Bros. Drilling Co. v. Tex. Moran Expl. Co.*, 829 P.2d 951, 954 (Okla. 1991)).

The Trust argues that Suburban, as the party bearing the burden of establishing an agency relationship, cannot point to any act of the Trust, the alleged principal, "suggesting that ATI [Jet] or Ms. Underhill was authorized to make binding representations concerning the Aircraft's maintenance history." Def.'s Mot. at 25. In response, Suburban argues that ATI Jet was integral to every step of the sale of the aircraft, acting as broker for the sale and advertising the Aircraft. Pl.'s Resp. at 19. Suburban argues that Ms. Underhill was also largely involved in the sale, communicating information about the Aircraft to Mr. Meyer on the Trust's behalf. *See id.* Finally, Suburban contends that the Trust, ATI Jet, and Ms. Underhill are "inextricably intertwined" due to an overlap in ownership, management, and participation. *See id.*

The Court agrees that the actions of Ms. Underhill and ATI Jet in facilitating the sale of the Aircraft, and the actions of the Trust in concluding the sale based on and in cooperation with the work done by Ms. Underhill and ATI Jet, are sufficient to allow a reasonable inference that Ms. Underhill and ATI Jet were authorized to act on behalf of the Trust. Moreover, even if the Court were to conclude otherwise, there still would exist a genuine dispute as to whether the Trust itself had a duty to disclose the $117,378.98 deferred maintenance cost and failed to do so. Viewing the summary-judgment record in the light most favorable to Suburban as the nonmovant, the Court concludes that the Trust

is not entitled to summary judgment based on an absence of an agency relationship between the Trust and ATI Jet or Ms. Underhill.[12]

CONCLUSION

For the forgoing reasons, Plaintiff Suburban Air, Inc.'s Motion for Summary Judgment (Doc. No. 43) is DENIED. Defendant Tohme Family Trust's Motion for Summary Judgment (Doc. No. 45)[13] is DENIED.

IT IS SO ORDERED this 11th day of April, 2022.

CHARLES B. GOODWIN
United States District Judge

---

[12] Because Ms. Underhill and ATI Jet are no longer defendants in this matter, the Court does not reach the Trust's argument that "[a]bsent an agency relationship, Suburban cannot show that ATI and/or Ms. Underhill engaged in fraud." Def.'s Mot. at 27.

[13] Defendant's previous Motion for Summary Judgment (Doc. No. 44), superseded by Defendant's Supplemental Motion for Summary Judgment (Doc. No. 45), is denied as moot.