## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **SUBURBAN AIR EXPRESS, INC.,** | ) | |
| **a Nebraska Corporation,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-21-39-G** |
| | ) | |
| **TOHME FAMILY TRUST, a Texas** | ) | |
| **Family Trust, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>OPINION AND ORDER</u>

On April 12 and 13, 2022, the Court conducted a bench trial on Plaintiff Suburban Air Express, Inc.'s claims of breach of contract and fraud under Oklahoma law against Defendant Tohme Family Trust. *See* Doc. Nos. 65, 66. Upon consideration of the evidence, the case record, and the parties' arguments, the Court finds and rules as follows:

*I. Findings of Fact*

A. <u>The Parties and Witnesses</u>

1. Plaintiff Suburban Air Express, Inc. ("Suburban") is an aircraft charter company. Tr. 7:5-15 (Doc. No. 68). Suburban contracts with the Bureau of Land Management and the United States Forest Service to provide aerial firefighting support in the State of Alaska. Tr. 7:7-10, 7:19-8:8. Suburban operates five aircraft, including two Cessna Citation 501 jets, one of which is the aircraft at issue in this litigation (the "Aircraft"). Tr. 8:9-9:1.

2. Suburban's President, Director of Operations, and part owner, Mark Meyer, is an experienced pilot, aircraft mechanic, and authorized aircraft inspector. *See* Tr. 6:9-

23, 9:25-12:16.  Mr. Meyer has extensive knowledge of and experience in the purchase and sale of aircraft.  Tr. 12:24-13:11.

3. Defendant Tohme Family Trust (the "Trust") is a trust created by trustor Roberto Tohme ("Mr. Tohme").  Tr. 170:10-14.

4.  Mr. Lyle Byrum ("Mr. Byrum") is the trustee for the Trust.  Tr. 170:13-16, 182:9-12.  He is also the Chief Operating Officer and Director of Operations for ATI Jet, Inc., a charter aircraft company.  Tr. 130:4-17, 180:2-6.  Mr. Byrum has held his pilot's license since 1973, and he is a certified multi-engine and single-engine aircraft instructor, a licensed aircraft mechanic and inspector, and an accountability manager for a repair station.  Tr. 181:1-182:3.

5. ATI Jet, Inc. ("ATI") provides charter jet services to its customers. Tr. 130:4-17, 131:13-15, 180:7-17.

6. DeeAnna Underhill ("Ms. Underhill") is Mr. Byrum's stepdaughter and the Director of Charter Sales and Customer Service for ATI.  Tr. 129:22-130:3, 131:8-12.  Ms. Underhill's primary job responsibilities include selling trips on ATI's charter jets. Tr. 130:4-131:7.

B.  The Aircraft and the Williams Engine Maintenance Program

7. The Trust purchased the Aircraft in or around March of 2012.  Tr. 171:2-3.  From 2012 until 2020, the Aircraft was maintained at ATI's headquarters in El Paso, Texas.  Tr. 171:22-172:24.

8. An engine maintenance program, or "EMP," is a contract through which the owner of an aircraft elects to pay the engine manufacturer for repairs and maintenance over

a period of time.  *See* Tr. 17:10-18:2.  Although EMPs can vary from provider to

provider and from contract to contract, *see* Tr. 193:5-194:1, one type of EMP allows

the aircraft owner to spread most or all of the costs associated with a "hot section"

inspection—typically, a time for major and expensive engine work—over the life

of the EMP, rather than facing a one-time charge at the time the work is done.  *See*

Tr. 17:10-25.[1]

9.  At the time the Trust acquired the Aircraft in 2012, the Aircraft's engines were

enrolled in the Williams TAP Elite program, an EMP offered by the manufacturer

of those engines, Williams International ("Williams").  Tr. 171:4-11; *see also* Pl.'s

Trial Ex. 5.  No contract related to this program was offered or admitted into

evidence.

10. In April of 2020 the Trust and Williams entered into a new contract that enrolled

the Aircraft's engines in the Williams TAP Blue program.  The April 2020 contract

between Williams and the Trust along with the amendment that was attached to and

was part of that contract—collectively referred to herein as the "Williams

Contract"—were admitted at trial.  *See* Def.'s Trial Exs. 2, 3.

11. Testimony and records offered at trial showed the following about the terms of the

Williams TAP Elite program that was in place for the Aircraft prior to April 2020

and the satisfaction of those terms by the Trust and Williams:

---

[1] A hot section inspection is an engine inspection done when the aircraft's engines reach a specified number of hours in service.  Order of Apr. 11, 2022 (Doc. No. 64) at 5 n.3.

    a. As of at least April 2020, at the end of the Aircraft's enrollment in the TAP Elite program, the Trust was obligated to make payments to Williams under a payment schedule whereby the Trust paid for each hour that the Aircraft's engines were flown, at a rate based on a multiple (110%) of the variable standard rate for repairs published by Williams.  *See* Tr. 188:18-20, 205:19-24; Pl.'s Ex. 5, at 2.

    b. The Trust made all hourly payments as required.  *See* Tr. 187:4-20.

    c. The Trust owed no money to Williams at the time the prior contract expired. Tr. 184:21-185:2, 195:16-196:17, 199:2-10.

12. In or around April 2020, Williams offered the Trust a new contract that would "upgrade" the Aircraft's EMP from TAP Elite to TAP Blue.  Tr. 202:18-204:5; *see* Def.'s Ex. 2.  Williams presented two different payment plans when negotiating the new contract with the Trust: (a) pay a multiple of the standard repair rate for each hour the engines are flown, due monthly, as the Trust had done previously; or (b) pay a lower rate for hours flown and, subsequently, a fee of approximately $110,000 (the "Balloon Payment") at the time of the next hot section inspection.  *See* Tr. 186:12-22, 202:19-204:11; Def.'s Ex. 2, at 1-2; Pl.'s Ex. 5, at 2.

13. Under either scenario, Williams would charge a fee of approximately $27,000 to upgrade the Aircraft's EMP from TAP Elite to TAP Blue (the "Upgrade Fee").

Williams agreed to defer the "Upgrade Fee" so that it was not due until the next hot section inspection.  Tr. 203:18-204:5; Def.'s Ex. 2, at 4.[2]

14. The Trust accepted Williams' offer to upgrade to the TAP Blue Program under the optional payment plan with a lower hours-flown rate and a subsequent balloon payment.  *See* Def.'s Exs. 2, 3; Pl.'s Ex. 19.

15.  The transition to the new Williams Contract and payment plan took effect on April 17, 2020.  Tr. 178:17-179:8, 189:14-19; Pl.'s Ex. 19.

16. The Trust maintained the Aircraft's records, including documentation of the Williams Contract, at ATI's headquarters in El Paso, Texas.  Tr. 171:22-172:24. The Aircraft's records, including the documentation associated with the Aircraft's EMPs, were maintained by Connie Parsons, who acted as controller for the contract. Tr. 171:22-172:7, 190:11-191:8.

C.  The Sale

17. The Trust listed the Aircraft for sale on at least two occasions: first in 2018, and again in April or May of 2020.  Tr. 172:13-16.  The Aircraft was originally offered for sale at its home base in El Paso, Texas, and was later moved to Dallas, Texas, to

---

[2] The amounts of the Balloon Payment and the Upgrade Fee were variable and would not be fixed until the time of the hot section inspection.  As reflected in the Amendment to the Williams Contract (included in Def.'s Exs. 2, 3), as well as an explanatory email provided to Suburban after the sale of the Aircraft (Pl.'s Ex. 19), Williams totaled the two amounts and "converted" them to engine hours, resulting in an assessment of 438.8 hours.  *See* Def.'s Ex. 3, at 4.  The amount due at the time of the next hot section inspection, then, would be calculated by multiplying the 438.8 hours by Williams' hourly repair rate at the time of that inspection.  *See id.*; Pl.'s Ex. 19; Tr. 40:15-18.

improve the Aircraft's accessibility to prospective purchasers.  Tr. 132:17-21, 172:17-24.

18. The Trust asked Ms. Underhill to show the Aircraft to prospective customers while it was housed in Dallas.  *See* Tr. 132:17-133:1.

19. Prior to moving the Aircraft, Mr. Tohme collected the logs, documents, aircraft manuals, and the Williams Contract so that they could be transferred to Dallas with the Aircraft.  Tr. 173:1-174:1.  Mr. Tohme testified that he collected the Williams Contract specifically, which was contained in a folder, and placed it in the smaller of two plastic boxes of records for the Aircraft.  Tr. 173:8-24.  Mr. Byrum testified that he made a copy of the Williams Contract and gave it to Mr. Tohme and that Mr. Byrum witnessed Mr. Tohme put the Williams Contract in the box of records.  *See* Tr. 191:12-192:9, 214:7-215:1, 246:23-247:7.

20. After placing the Williams Contract in one of the two boxes of records, Mr. Tohme personally placed the boxes on the Aircraft, flew the Aircraft to Dallas, unloaded the boxes, and placed them in an ATI office adjacent to Ms. Underhill's office.  Tr. 173:23-174:6.  The records were kept locked in that office, which was not generally accessible.  Tr. 176:13-25.

21. In 2019, Suburban had acquired a different Citation 501 Eagle II jet from a private seller in California (the "Citation").  Tr. 15:16-24.  The Citation, like the Aircraft, had Williams engines and was enrolled in a Williams EMP.  Tr. 16:6-7, 17:5-9.  The Citation was not enrolled in the TAP Blue program at the time of purchase but was upgraded to that program by Suburban after its purchase.  Tr. 17:9-18:9.  A $35,000

upgrade charge associated with that upgrade was deferred until the next hot section inspection for the Citation.  Tr. 18:17-19:2.

22.  Suburban was generally pleased with the Citation and decided in the second half of 2020 to begin searching for a similar aircraft.  Tr. 19:18-20:24, 24:2-4.

23. Following an online search, Suburban identified three Eagle II jets for sale, including the Aircraft.  Tr. 20:25-21:9.

24. The Aircraft appealed to Suburban because Suburban believed the Aircraft (a) was likely to have equipment similar to that in Suburban's existing Citation, (b) was approximately 2000 hours away from its next major inspection date, (c) had certain engine and wing modifications of interest to Suburban, (d) was current on phase inspections, (e) was unlikely to require a mandatory hot section inspection soon after purchase based upon the engine times (i.e., the hours flown), and (f) was enrolled in the Williams TAP Blue program.  Tr. 21:15-23:15; Pl.'s Ex. 16.

25.  On or around September 28, 2020, Mr. Meyer, on behalf of Suburban, contacted ATI by phone and requested information regarding the Aircraft, which Ms. Underhill provided.  Tr. 133:2-134:25; Def.'s Ex. 4.  Ms. Underhill verbally informed Mr. Meyer that the Aircraft was enrolled in the Williams TAP Blue program and was subject to a deferred upgrade fee of $27,000, which would be due at the next hot section inspection; Ms. Underhill did not mention, however, the Balloon Payment also due at the next hot section inspection.  Tr. 134:9-22, 157:23-158:18.

26. Mr. Meyer followed up with several emails concerning the Aircraft, asking among other things whether the owner could complete the sale quickly.  Tr. 26:11-14, 76:13-15, 135:9-13; Pl.'s Ex. 1; Def.'s Ex. 5.

27. Ms. Underhill directly provided some information concerning the Aircraft to Mr. Meyer.  She testified that she obtained most of that information from the Trust.  Tr. 150:22-151:14.  She also testified that information relating to the Williams Contract was provided to her by Williams.  Tr. 152:4-16.  Although Ms. Underhill had an email from Williams explaining the costs associated with the Williams Contract, Ms. Underhill found this explanation and the TAP Blue program generally to be confusing—a position she shared with Mr. Meyer.  *See* Tr. 139:23-141:13, 152:12-16, 160:8-162:3, 165:18-24.

28. Suburban decided to move forward with an inspection of the Aircraft, informing Ms. Underhill that it wanted to do so quickly so that the Aircraft could be flown to Alaska by the end of October.  Tr. 31:21-24, 76:1-77:1.  In response to Suburban's request, Ms. Underhill set up an inspection for Sunday, October 4, 2020.  Tr. 135:22-136:20.

29. Mr. Meyer and a friend, Bradley Silverstein, travelled to Dallas on or around October 4, 2020, to inspect the Aircraft.  Tr. 77:2-78:4; Def.'s Ex. 6.  Upon Mr. Meyer's arrival at the ATI hangar in Dallas, Ms. Underhill told Mr. Meyer and Mr. Silverstein that she was neither a pilot nor a mechanic, but that the Aircraft's owners, who were standing by, would be able to answer any questions Suburban might have concerning the Aircraft.  *See* Tr. 137:9-15.

30. Mr. Meyer and Mr. Silverstein spent five to six hours inspecting the Aircraft and its records.   Tr. 36:19-25, 78:15-19.   Two of those hours were spent conducting a physical inspection of the Aircraft itself, and two to four hours were spent inspecting the Aircraft's records, which were located in two plastic "totes," each of which weighed 40 to 50 pounds.   Tr. 35:22-36:25, 78:22-23, 137:22-138:11, 139:17-23. Mr. Meyer testified that he did not find a copy of the Williams Contract during his inspection of the Aircraft's records.   Tr. 38:20-22.[3]

31. Upon evaluation of all the evidence, and having assessed the credibility of the witnesses and the weight to be given their respective testimony, the Court finds that

---

[3] Mr. Meyer has further testified that, in connection with this litigation, he searched the Aircraft's records and was unable to locate a copy of the Williams Contract during that search. *See* Tr. 100:23-101:19. The Trust has moved to exclude this testimony pursuant to Federal Rule of Civil Procedure 37(c)(1) for Suburban's failure to disclose or supplement discovery responses relevant to this issue. *See* Def.'s Mot. to Exclude (Doc. No. 69) at 5-8.

The Tenth Circuit identifies the following factors for determining whether a failure to disclose or supplement is substantially justified or harmless: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999). It has been Suburban's position throughout this litigation that the Williams Contract was not in the two boxes of the Aircraft's records, and so Mr. Meyer's testimony at trial could not reasonably have surprised the Trust. Additionally, this testimony did not prejudice the Trust or afford Suburban a tactical advantage. Mr. Meyer's brief answer on cross examination that after his deposition he went back through the Aircraft's records in Fairbanks, Alaska, and could not find the Williams Contract is not compelling evidence that the Williams Contract was not in the boxes of records at the time of his initial inspection in Dallas, Texas, well over a year prior.

The relevant factors therefore weigh in favor of finding that any failure by Suburban to disclose or supplement its discovery responses on this issue was harmless. Accordingly, the Court DENIES Defendant's Motion to Exclude (Doc. No. 69).

the Williams Contract was in the boxes of records made available to Suburban at the time of its inspection of the Aircraft.  In making this finding, the Court notes that Mr. Meyer's failure to locate a copy of the Williams Contract during the inspection is not sufficient to show that the Williams Contract was not included in the materials provided.  Mr. Meyer spent only two to four hours reviewing documents that filled two plastic boxes, each weighing around 40 to 50 pounds.  Tr. 35:22-36:25, 78:22-23, 137:24-138:11, 139:17-23.  And, during this review, Mr. Meyer was not looking for the Williams Contract, but was instead looking for inspection sign-offs, paperwork for modifications, Sierra Trax maintenance records, and information on engine times, as he assumed a document like the Williams Contract would be kept somewhere other than in the boxes he was inspecting.  Tr. 37:1-38:25, 83:7-18.  In contrast, both Mr. Tohme and Mr. Byrum expressly recalled that Mr. Tohme placed the Williams Contract in the boxes containing the Aircraft's records and that these boxes were kept in a secure location until the time of Mr. Meyer's inspection.   Tr. 173:8-174:4, 176:13-25; 191:2-192:6, 214:7-215:12, 246:23-247:7.

32. After Mr. Meyer inspected the records, he discussed the Williams Contract with Ms. Underhill while the Aircraft was being towed onto the ramp for engine runs. Tr. 73:12-19.  Ms. Underhill testified that, during this conversation, she told Mr. Meyer that she did not understand the terms of the Williams Contract and that he should contact Williams for an explanation of the contract's terms.  Tr. 139:24-141:13.  Mr. Meyer did not refute this testimony.

33. The Aircraft's engines did not start during the engine-run portion of the inspection. Tr. 81:7-15.  Ms. Underhill, who did not know how to resolve the issue, Tr. 81:16-19, called Mr. Tohme, who explained the cold start procedure to Mr. Meyer.  Tr. 29:18-30:15, 81:20-24.  Mr. Tohme also spoke with Suburban on a separate call regarding a battery connection issue.  Tr. 82:3-13.  These two calls were Suburban's only direct correspondence with either Mr. Tohme or Mr. Byrum prior to Suburban's purchase of the Aircraft.  Tr. 174:7-25; 194:2-195:4.

34. Mr. Meyer had no concerns about moving forward with the sale without seeing the Williams Contract, primarily because he assumed those terms "would be the same as [Suburban's] previous aircrafts" and because he thought the approximately $27,000 Upgrade Fee due at the next hot section "sounded about right for the times on the engines and what it would cost to do the upgrade."  Tr. 39:1-14.  It "didn't occur to" Mr. Meyer to ask Ms. Underhill for a copy of the Williams Contract before, during, or after the inspection, and he did not bring up the Williams Contract—or its absence—in any of his correspondence between the time of the inspection and the time of closing.  Tr. 39:15-20; 73:21-74:2 (Mr. Meyer stating that he did not ask for the Williams Contract at the inspection but that he did ask for it after closing); Tr. 139:10-15.

35. As a result of the inspection, Mr. Meyer raised five separate items with the Trust and requested that those items be resolved prior to sale.  Tr. 28:8-25, 141:17-23; Pl.'s Ex. 2, at 2.  None of those items involved the Aircraft's records or the Williams Contract.  Tr. 28:8-25; Pl.'s Ex. 2, at 2.

36. The Trust and Suburban agreed that, rather than resolving the five items raised by Suburban, the Trust would decrease the sale price of the Aircraft and Suburban would be responsible for correcting the five items of concern. *See* Tr. 27:5-28:2, 29:1-13, 143:1-16; Pl.'s Ex. 2.

37. During the post-inspection negotiations, Suburban noted that certain inspections were due to occur by October 31, 2020. Tr. 30:20-31:10. Suburban informed the Trust that it preferred that the inspections be performed during an avionics upgrade at its facility in Fairbanks, Alaska, rather than in Texas, and therefore requested to close the sale on or before the October 31st inspection deadline. Tr. 30:11-32:1.

38. At Mr. Meyer's invitation, Mr. Byrum prepared the first draft of the Aircraft Purchase Agreement (the "APA") and sent it to Suburban shortly after the parties agreed on a price. Tr. 143:10-23. Suburban requested changes to the initial draft, all of which were made by the Trust. Tr. 85:2-8, 143:24-144:6. The negotiation and execution of the APA were completed within three days of the Parties' agreement on the purchase price. Tr. 31:21-32:16.

39. Mr. Meyer later informed Ms. Underhill that Suburban had contacted Williams regarding the transferability of the TAP Blue Program and that everything was set for the sale to proceed. Tr. 75:6-10, 95:23-25, 144:22-25.

40. Mr. Meyer agreed on behalf of Suburban that the Aircraft's records "were fully satisfactory" at the time of the execution of the APA. Tr. 111:4-10; Pl.'s Ex. 20, at 15 (APA Exhibit D—Aircraft Delivery Receipt).

41. After the APA was executed on October 8, 2020, the Aircraft was transferred to Suburban and flown to Fairbanks, Alaska, on October 25, 2020.  Tr. 32:7-19.

42. Section 10.18 of the APA provides:

> **10.18 Engine Maintenance Program:** The Aircraft is enrolled on the "Williams TAP BLUE" engine maintenance program, which shall be transferable to the Buyer.  Any and all fees, charges or costs related to the TAP BLUE Engine Maintenance program on each respective engine, which is incurred or accrued prior to the engine times at the time of Delivery, excluding any program upgrade deferment costs not due until next hot section, shall be the sole responsibility of the Seller and shall be paid prior to or at the time of Closing.  Any and all fees, charges or cost related to the Engine Maintenance program on each respective engine, which is incurred or accrued subsequent to the engine times at the time of Delivery, including any program upgrade deferment costs not due until next hot section, shall be the responsibility of the Buyer.  Any transfer fees including but not limited to buy-in fee shall be the responsibility of the Buyer.

Agt. § 10.18 (Pl.'s Ex. 20).

D.  The Dispute Arises

43. After the Aircraft was flown to Alaska, a Suburban employee contacted Williams to transfer the Williams Contract to Suburban.  During that call, Williams told Suburban that the total amount due at the next hot section inspection was approximately $144,000.  Tr. 44:2-8.

44. Suburban asked Williams for a copy of the Williams Contract.  Tr. 44:2-12; Pl.'s Ex. 6.

45. Mr. Meyer sent an email to Ms. Underhill asking for confirmation that the "deferral" for the Williams EMP was $27,000.  Tr. 33:24-34:6; Pl.'s Ex. 4.  Ms. Underhill agreed, and forwarded an April 2, 2020, email from Williams to Mr. Meyer detailing

the costs associated with the upgrade from TAP Elite to TAP Blue.  Tr. 34:4-25; Pl.'s Ex. 5.

46. Mr. Meyer contemporaneously expressed his displeasure to learn that approximately $144,000, not just $27,000, would be owed to Williams at the time of the next hot section inspection for the Aircraft.  Tr. 39:20-40:9.

47. Suburban ultimately elected to maintain the Aircraft's enrollment in the Williams TAP Blue program, signing a new contract under which it agreed to pay the deferred $27,000 Upgrade Fee that had been disclosed by Ms. Underhill.  Rather than pay a lower hourly rate with a subsequent balloon payment, however, Suburban chose a payment schedule with a higher rate for hours flown under the contract but no balloon payment due at the next hot section inspection.  Tr. 46:18-47:23; Pl.'s Ex. 14.

## II.  Conclusions of Law

Suburban contends that, pursuant to Section 10.18 of the APA, the Trust was responsible for payment of the Balloon Payment, an amount estimated at the time of trial to be $126,000.[4]  Accordingly, Suburban asserts a claim for breach of the APA.  Further, Suburban contends that the Trust, by disclosing the Upgrade Fee but not the Balloon Payment, fraudulently misrepresented the amount owing to Williams.

---

[4] This total for the Balloon Payment represents the amount that would be owed upon applying Williams' standard repair rate at the time of trial.  *See* Tr. 61:1-7.  Suburban moved to amend the pleadings to conform to the evidence on the issue of damages at the close of its case-in-chief.  The Court sustained this motion without objection.  *See* Tr. 115:1-11, 127:1-7.

A. <u>Breach of Contract</u>

To recover on a breach of contract claim under Oklahoma law, a plaintiff must establish by the preponderance of the evidence: "1) formation of a contract; 2) breach of the contract; and 3) damages as a direct result of the breach." *Digital Design Grp., Inc. v. Info. Builders, Inc.*, 24 P.3d 834, 843 (Okla. 2001). "A contract should receive a construction that makes it reasonable, lawful, definite and capable of being carried into effect if it can be done without violating the intent of the parties." *May v. Mid-Century Ins. Co.*, 151 P.3d 132, 140 (Okla. 2006).

The parties agree that they entered into a valid, enforceable contract for the sale of the Aircraft—the APA. The parties further agree that Section 10.18 of the APA controls and governs which party bears which costs owed to Williams under the Williams Contract. *See* Doc. No. 70, at 15; Doc. No. 71, at 27-28.

Section 10.18 of the APA unambiguously provides that "[a]ny and all fees, charges or costs related to the TAP BLUE Engine Maintenance program on each respective engine, which is incurred or accrued prior to the engine times at the time of Delivery, excluding any program upgrade deferment costs not due until next hot section [inspection], shall be the . . . responsibility of the Seller," but "[a]ny and all fees, charges or cost related to the Engine Maintenance program on each respective engine, which is incurred or accrued subsequent to the engine times at the time of Delivery, including any program upgrade deferment costs not due until next hot section, shall be the responsibility of the Buyer." Agt. § 10.18. Suburban argues that the Balloon Payment was, in whole or in part, "incurred or accrued" prior to the delivery of the Aircraft and therefore is the Trust's responsibility.

This interpretation runs counter to Section 10.18's plain meaning of when a cost is incurred or accrued. The two payment plans offered to the Trust by Williams were simply different ways of paying in advance for repairs expected to be needed at the time of the hot section inspection. One payment schedule spread the expected cost evenly over the hours flown, and the other spread some of the expected cost but left a significant payment to be made at the time of the inspection. The fact that the Trust entered into a contract with a payment schedule (whether even-weighted or end-weighted) does not mean that the entirety of the cost was incurred, or accrued, at the time of contracting. Rather, the Trust's obligation to pay any scheduled payment would accrue, and the cost would be incurred, at the time set forth in the schedule for that particular payment. *See Evans v. Kirke-Van Orsdel*, 122 F. App'x 947, 949 (10th Cir. 2004) (recognizing that, under Oklahoma law, a court "will not create an ambiguity by using a forced or strained construction, by taking a provision out of context, or by narrowly focusing on the provision" (internal quotation marks omitted)).[5] In particular, the Trust's obligation to pay the Balloon Payment under the Williams Contract had not accrued prior to delivery of the Aircraft, and it would not accrue until the Aircraft actually underwent a hot section inspection from Williams.[6]

---

[5] The Court finds that the category specified in Section 10.18 of the APA of "any program upgrade deferment costs not due until the next hot section," Agt. § 10.18, includes the Upgrade Fee but not the Balloon Payment. Under the terms of the Williams Contract, the Balloon Payment is an aspect of the payment schedule and—while described by Williams as a deferred cost, *see* Def.'s Ex. 3; Pl.'s Ex. 19—is clearly not an aspect of the upgrade from TAP Elite to TAP Blue such as would make that cost a "program *upgrade* deferment cost[]." Agt. § 10.18 (emphasis added). This distinction does not affect the analysis set forth above.

[6] At the time that Suburban and Williams entered into a new contract that superseded the April 2020 contract between the Trust and Williams (i.e., the Williams Contract), Williams

The APA only obligates the Trust to pay those EMP costs, other than the Upgrade Fee, that were "incurred or accrued prior to the engine times at the time of Delivery." Agt. § 10.18. Because no hot section inspection occurred prior to delivery, and therefore the obligation to pay the Balloon Payment did not accrue prior to the engine times at the time of delivery, Suburban and not the Trust is responsible for the Balloon Payment under the APA. Accordingly, the Trust cannot be held liable for breach of contract based on its failure to pay that cost.

B. Constructive Fraud

Suburban's claim of fraud is based upon a theory of constructive fraud. Constructive fraud, as prescribed by the Oklahoma Statutes, is "any breach of a duty which, regardless of the actor's intent, gains an advantage by misleading another to his prejudice." *Sutton v. David Stanley Chevrolet, Inc.*, 475 P.3d 847, 854 (Okla. 2020); *see* 15 Okl. Stat. § 59(1). Fraud is never presumed, and each of its elements must be established by clear and convincing evidence. *Simon v. Metro. Prop. & Cas. Ins. Co.*, No. CIV-08-1008-W, 2014 WL 12479649, at *6 (W.D. Okla. Apr. 17, 2014).

"[W]hen dealing with alleged omissions and partial disclosures, the first question is always whether there was a duty upon the actor to disclose the whole truth." *Sutton*, 475 P.3d at 854. "Where the peculiar circumstances give rise to a duty on the part of one of the parties to a contract to disclose material facts and the party remains silent to his or her

---

had not performed a hot section inspection on the Aircraft and had not invoiced the Balloon Payment. Consequently, the obligation to pay the Balloon Payment has never been incurred or accrued.

benefit and to the other party's detriment, the failure to speak constitutes fraud." *Id.*  A duty of full disclosure may arise (1) pursuant to "a general fiduciary duty owed by the defendant to the plaintiff," or (2) "even though it might not exist in the first instance, once a defendant voluntarily chooses to speak to [a] plaintiff about a particular subject matter." *Specialty Beverages, L.L.C. v. Pabst Brewing Co.*, 537 F.3d 1165, 1180 (10th Cir. 2008) (emphasis and internal quotation marks omitted) (applying Oklahoma law).

Here, there is no allegation that the Trust owed Suburban a general fiduciary duty. Suburban argues, however, that the Trust had a duty to correct the misimpression created when Ms. Underhill disclosed the $27,000 Upgrade Fee but did not simultaneously inform Suburban of the Balloon Payment.  This contention fails in several respects.

First, Suburban has not produced sufficient evidence to establish that Ms. Underhill was the Trust's agent with actual or apparent authority to make representations concerning the Williams Contract that would bind the Trust.  "The burden of proving the existence, nature and extent of the agency relationship rests ordinarily upon the party who asserts it," in this case Suburban.  *Enter. Mgmt. Consultants, Inc. v. Okla. ex rel. Okla. Tax Comm'n*, 768 P.2d 359, 362 (Okla. 1988).  A principal will be liable for its agent's conduct if a "right of control" is present, meaning that the principal had the power to give the agent directions and the agent had a duty to obey those directions.  *See Le v. Total Quality Logistics, LLC*, 431 P.3d 366, 373 (Okla. Civ. App. 2018).  Suburban has presented no evidence supporting that the Trust had the right of control over how Ms. Underhill showed the Aircraft or interacted with potential buyers.

18

A principal may also be held liable for its agent's actions if the principal's conduct causes the plaintiff to reasonably believe the agent had authority to act on the principal's behalf. *See Thornton v. Ford Motor Co*., 297 P.3d 413, 420-21 (Okla. Civ. App. 2013). Suburban has not presented sufficient evidence to support that *the Trust* ever acted in such a way to cause Suburban to reasonably believe that Ms. Underhill had the authority to act on the Trust's behalf in making representations regarding the Williams Contract.  All of Mr. Meyer's communications concerning the Williams Contract and the Aircraft's EMP were with Ms. Underhill.  Mr. Meyer's communications with Mr. Byrum (the trustee) and Mr. Tohme (the trustor) did not concern Ms. Underhill or the Aircraft's EMP.  Further, Ms. Underhill's own statements to Suburban reflected she lacked the knowledge and the authority necessary to make representations concerning the Williams Contract on behalf of the Trust.  *See* Tr. 139:24-141:13.  In light of the absence of evidence establishing that Ms. Underhill had any authority—actual or implied—to make representations concerning the Williams Contract on the Trust's behalf, Plaintiff cannot rely on Ms. Underhill's statements to establish a wrongful omission or a partial disclosure that imposed upon the Trust a duty to affirmatively make a full disclosure.  *See Sutton*, 475 P.3d at 854.[7]

---

[7] Suburban also argues that the Trust had a duty to disclose the Balloon Payment due to a provision in the Williams Contract.  *See* Pl.'s Ex. 19 ("In the event the aircraft is sold prior to deferred payments being made, current owner must disclose the details of this contract to the new prospective buyer before the actual sale of the aircraft.  The new owner will have the option of continuing the program with the same deferred back hour requirement, or arrange to buy-out the remaining back hours due on the deferment.").  Suburban was not a party to the Williams Contract and does not claim to be a third-party beneficiary under that contract.  Accordingly, the Court concludes that Suburban has failed to establish that the Williams Contract created a duty of disclosure vis-à-vis the Trust and Suburban.

Further, relevant to both the question of whether there was a partial disclosure that gave rise to a duty of full disclosure, and the ultimate question of whether Suburban reasonably relied on a material omission, the Court has found that the Trust provided to Suburban the Williams Contract that set forth the EMP payment schedule in place at the time of the sale, including the requirement of a balloon payment at the time of the next hot section inspection.  Given Suburban's access to the Williams Contract and its experience purchasing airplanes similar to the Aircraft, it was not justifiable to ignore the terms of that agreement and rely, instead, upon statements or omissions made by the Trust or Ms. Underhill concerning the payments due under that agreement.  *See State ex rel. Sw. Bell Tel. Co. v. Brown*, 519 P.2d 491, 495 (Okla. 1974) (explaining that the plaintiff's reliance must be "justifiable"); *Silver v. Slusher*, 770 P.2d 878, 881 n.8 (Okla. 1988) ("An action for fraud may not be predicated on false statements when the allegedly defrauded party could have ascertained the truth with reasonable diligence." (emphasis omitted)).

Because Suburban has not established its fraud claim by clear and convincing evidence, the Trust cannot be liable based on a theory of constructive fraud.

CONCLUSION

For the reasons explained above, the Court finds that the Tohme Family Trust is not liable upon Suburban Air Express, Inc.'s claims for breach of contract and fraud.   A separate judgment shall be entered.

IT IS FURTHER ORDERED that the Motion to Exclude (Doc. No. 69) is DENIED.

IT IS SO ORDERED this 27th day of September, 2023.

CHARLES B. GOODWIN
United States District Judge